**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**KIEZ COLLINS,**

              **Petitioner,**

      **v.**

**WARDEN, SOUTHEASTERN**
**CORRECTIONAL INSTITUTION,**

        **Respondent.**

      **Civil Action 2:21-cv-5073**
      **Judge Edmund A. Sargus, Jr.**
      **Magistrate Judge Chelsey M. Vascura**

**REPORT AND RECOMMENDATION**

    Kiez Collins, a state prisoner who is proceeding without the assistance of counsel, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter is before the Court to consider the Petition (ECF No. 3), the State Court Record (ECF Nos. 9, 11), and Respondent's Answer/Return of Writ (ECF No. 10). Petitioner did not file a reply to Respondent's Answer/Return of Writ. For the reasons that follow, the undersigned Magistrate Judge **RECOMMENDS** that this Court **DENY** the grounds in the Petition and **DISMISS** the Petition **WITH PREJUDICE**.

**I.     FACTS AND PROCEDURAL POSTURE**

    Petitioner challenges his convictions in the Franklin County, Ohio, Court of Common Pleas. (ECF No. 3, PageID 26.) Ohio's Tenth District Court of Appeals summarized the facts and procedural history of that case as follows:

> {¶ 2} On June 4, 2018, appellant was indicted on one count of aggravated robbery in violation of R.C. 2911.01 (Count 1), two counts of aggravated murder in violation of R.C. 2903.01 (Counts 2 and 3), and two counts of murder in violation of R.C. 2903.02 (Counts 4 and 5). Each count included a three-year firearm

1

specification pursuant to R.C. 2941.145. The indictment arose out of the shooting death of DeSean Bonet on May 26, 2018.

{¶ 3} The matter proceeded to a jury trial in May 2019, at which the state presented the following pertinent evidence. Commencing at approximately 4:30 a.m. on May 26, 2018, the Columbus Division of Police received a series of three anonymous 911 calls regarding a shooting near the intersection of Wilson Avenue and East Deshler Avenue. Plaintiff-appellee, State of Ohio, did not provide a transcript of the 911 calls; however, audio from each of the three calls was played for the jury. The first and second callers reported hearing three or four gunshots, followed by the sound of a man moaning; neither caller had seen anyone in the area. The third caller reported that he heard one or two gunshots and saw a young black man running down the street; the man eventually fell to the ground. The caller averred that he did not know who had fired the shots.

{¶ 4} Within minutes of the 911 calls, Officer Joshua Watson was dispatched to the scene. Upon arrival, Officer Watson observed a man, later identified as Bonet, lying on his back in the grassy area between the sidewalk and the street just north of the Wilson/East Deshler intersection. Bonet had blood around his nose and mouth; he was immobile and not breathing. Officer Watson observed two spent shell casings in the street, approximately 15 to 25 feet from Bonet's body. He did not see any weapons or narcotics in the area.

{¶ 5} Detective Lowell Titus arrived at the scene at approximately 5:30 a.m. He observed two spent shell casings in the street as well as blood on a nearby curb and in the grass. He further noted that a residence located at 1263 Wilson Avenue, just south of the Wilson/East Deshler intersection, had a video surveillance camera mounted on the front porch. In addition, he observed several broken items on the front porch of a residence located at 1267 Wilson Avenue.

{¶ 6} Detectives Raymond Guman and Mark Burghart took numerous still photographs of the crime scene, including the interior and exterior of 1267 Wilson Avenue. Among other things, the photographs depict the sidewalk and three concrete steps leading to the front porch. Interior photographs of the living room depict a small, semiautomatic handgun with an inserted magazine hidden behind several items on the fireplace mantel. The firearm had one live round in the chamber and two live rounds in the magazine. The photographs also depict a clear plastic baggie containing a "green leafy substance" on a shelf in the living room. (May 14, 2019 Tr. at 299.)

{¶ 7} Shortly after the incident, Detective Jennifer Gribi interviewed several people in the neighborhood, including a man who lived at 1267 Wilson Avenue. The man identified himself as Tom Collins and provided a date of birth. She later learned that the man's name was Kiez Collins and that he had admitted to other detectives that he had provided her with a false name and date of birth.

{¶ 8} Lindsay Brokaw testified that she lived at 1263 Wilson Avenue, two doors north of 1267 Wilson Avenue. At approximately 4:30 a.m. on May 26, 2018, she awoke to the sound of gunshots. She looked outside, saw nothing unusual, and returned to bed. Ten to fifteen minutes later, she awoke to police lights in the neighborhood. Soon thereafter, police officers knocked on her door and asked if she had seen anything. She told the officers that she had viewed video footage recovered from a security camera mounted at the top left corner of her porch. The officers viewed approximately ten minutes of the footage from Brokaw's phone. They later retrieved it from her computer. During Brokaw's testimony, the state played the video footage for the jury. Brokaw identified the video footage as that retrieved from her security camera. Although she knew appellant from the neighborhood, she could not identify him in the video footage.

{¶ 9} The video footage does not capture the front porch of 1267 Wilson Avenue. The footage depicts a young, black male, later identified as Bonet, running northbound on Wilson Avenue toward the East Deshler intersection. Almost simultaneous with Bonet's appearance in the camera view, two gunshots are heard. Bonet continues to run northbound, away from 1267 Wilson Avenue. Moments later, another man, later identified as appellant, appears in the frame. Appellant chases Bonet down the street and fires two shots in quick succession. Bonet then falls to the ground on the northeast side of the intersection. Bonet can be heard saying, "you got it, you got it" followed by an expletive. (State's Ex. A.) Appellant approaches Bonet, picks up something from the ground near where Bonet fell, and walks south on Wilson Avenue.

{¶ 10} Appellant was eventually arrested. Pursuant to the arrest, the police swabbed appellant's hands for gunshot residue. A forensic scientist from the Ohio Bureau of Criminal Identification and Investigation tested the swabs and found the presence of gunshot residue on appellant's hands. A forensic scientist from the Columbus Police Crime Laboratory examined the handgun recovered from 1267 Wilson Avenue and determined that it was operable. Comparison of the spent cartridge cases and bullets recovered from the crime scene to test cartridge cases and bullets fired from the recovered handgun proved inconclusive as to whether the examined items had been fired from the same weapon.

{¶ 11} Franklin County Deputy Coroner Donald Pojman, M.D., performed an autopsy on Bonet on May 27, 2018 and prepared a report of his findings. That report indicates that Bonet sustained three penetrating[1] gunshots wounds, one to the chest on the "right side of the mid back," one to the pelvis "on the left buttock," and one to the left lower leg. (State's Ex. G.) The report further states that the bullet to the chest travelled from "back to front, upwards and slightly right to left," the bullet to the pelvis travelled from "back to front and left to right," and the bullet to the leg travelled from "back to front and upward." *Id.* Dr. Pojman's report lists Bonet's

---

[1] "Dr. Pojman defined a 'penetrating gunshot' as one where 'the bullet enters the body but does not leave the body.' (May 15, 2019 Tr. at 436.)" *Collins*, 2020-Ohio-3126, ¶ 11, n.1.

cause of death as "[g]unshot wounds of the torso" and the manner of death as homicide. *Id.*

{¶ 12} The court called John Watson, Jr., as its own witness pursuant to subpoena. During the state's examination, Watson testified that on May 26, 2018, he lived across the street from 1261-1263 Wilson Avenue. He knew appellant casually from the neighborhood. Because it was warm outside, the windows in his house were open. Sometime before 4:30 a.m., he heard appellant say, "[m]an, where's my shit at?" (May 15, 2019 Tr. at 470.) A man Watson did not know responded, "[c]hill out. Chill out. I don't know what you're talking about." *Id.* Watson observed appellant "steadily approaching" the man, who was walking backward on Wilson Avenue toward East Deshler Avenue. *Id.* Appellant repeatedly asked the man "[w]here's my shit at." *Id.* at 474. The man repeatedly responded "[c]hill out. I don't know. I don't know what you're talking about." *Id.* The man eventually bumped into a car that was parked on Wilson Avenue; appellant pulled out a pistol and shot the man two times. Watson saw the man take two or three steps and then fall to the ground. Appellant then looked at his cell phone, put his gun in his pocket, and walked toward his house; he eventually ran between two houses. Watson testified that he was interviewed by the police after the incident and reported what he had seen.

{¶ 13} During his examination of Watson, defense counsel played the video footage obtained from Brokaw's security camera. Watson acknowledged that what was depicted on the video footage was somewhat inconsistent with the testimony he provided during the state's questioning. In particular, Watson noted that the video footage establishes that four shots were fired, not two. When asked to explain this discrepancy, Watson averred "I might have heard the last two shots, but I didn't hear the first two shots." *Id.* at 488.

{¶ 14} At the conclusion of the state's case-in-chief, defense counsel made a Crim.R. 29 motion for judgment of acquittal. The trial court granted the motion as to Counts 1 and 2 [aggravated robbery and aggravated murder], dismissed those counts, and denied the motion as to Counts 3, 4, and 5 [aggravated murder, purposeful murder, and felony murder].

{¶ 15} Cameran Thompson testified in appellant's case. Thompson acknowledged that he was a convicted felon and was currently on probation. He averred that he had known appellant for several years and considered him to be "like a brother." (Tr. at 519.) Although he had known Bonet for a couple of years, the two men were not close friends.

{¶ 16} On May 26, 2018, several people, including Bonet and a man named Drako, were hanging out at Thompson's house. At some point, the group began discussing a plan to rob appellant of the marijuana they knew he sold from his home. Thompson objected to the planned robbery because he knew that appellant kept

4

only a small amount of marijuana at his house. However, he did not attempt to warn appellant because he did not believe the group would carry out the plan.

{¶ 17} Appellant testified that on May 26, 2018, he lived with his mother at 1267 Wilson Avenue. He worked temporary warehouse jobs and sold small amounts of marijuana to family and friends. At approximately 4:00 a.m. on May 26, 2018, appellant made plans to sell marijuana to a friend named Drako, who was to meet appellant at his house. Appellant sat on the front porch waiting for Drako to arrive; he did not lock the front door when he exited the house. He had a loaded firearm in his left pocket for protection because his mother recently had been attacked in their home.

{¶ 18} A man he did not recognize (Bonet) approached and asked if he knew where he could get some marijuana. Appellant was "leery" of Bonet because he was a stranger and it was 4:00 a.m. *Id.* at 542-43. Appellant noticed that Bonet had his right hand in his pocket. He was afraid that Bonet might rob him and enter the house. Appellant told Bonet that his friend was coming to buy all the marijuana he had but that the friend might be willing to sell him part of what he bought from appellant. He also told Bonet to come back another time. Bonet then asked appellant if he could see the marijuana. Appellant handed him the marijuana, which was in a clear plastic baggie. Bonet looked at it, smelled it, and then returned it to appellant. Appellant put the marijuana in his pocket.

{¶ 19} Almost immediately thereafter, Bonet pushed appellant against the front door and grabbed the marijuana from appellant's pocket. Appellant testified that at this point, he was "in fear of [his] life." *Id.* at 544. He felt he had no means of escape; he could not physically overpower Bonet nor run inside the house or around the side of the house. He was "nervous" and "excited" and "scared" because Bonet still had his hand in his pocket. *Id.* at 545. At this point, appellant reached into his pocket and slid the safety off his gun. When Bonet "started turning a little bit," appellant saw this as "my window of opportunity to pull out the gun and fire." *Id.* Appellant testified "[t]hat's when I fired, and [Bonet] took off running. I started firing towards the ground, like, to try to get him away so I could run back inside my house and call the police." *Id.* Bonet started running north toward East Deshler Avenue. Afraid that Bonet would turn around and shoot at him "because * * * I had shot at him," appellant fired three more shots in an effort to "get [Bonet] at least to the other side of Deshler, far enough for me to run back up through the middle of the houses and back inside the house through the back." *Id.* at 547. Appellant did not realize how many shots he had fired because he "just reacted" to a "life-or-death situation." *Id.* He was "so scared" and believed it "was either act or something might happen to me." *Id.*

{¶ 20} Once Bonet fell to the ground, appellant stopped shooting because he no longer felt Bonet posed a threat to him. Indeed, after appellant fired the last two shots, Bonet said "[y]ou got it. You got it." *Id.* at 548. Appellant interpreted this statement to mean that Bonet had "surrendered and maybe he didn't have a gun or

maybe it just wasn't loaded or anything and he dropped it." *Id.* Appellant walked toward Bonet, stopped one or two feet from where he lay on the ground, picked up the baggie of marijuana Bonet had taken from him, and started walking toward his house. He turned around to see if Bonet was still on the ground. When he saw that he was, he became concerned that Bonet had been hit by one of the shots he had fired. Appellant ran to his house, locked both doors, and called 911. He did not provide his name or indicate that he had shot Bonet. Appellant denied that he chased Bonet down the street in order to retrieve the marijuana.

{¶ 21} On cross-examination, appellant admitted that he intentionally fired his weapon four times in Bonet's direction; however, he denied that he was trying to shoot him. Rather, he "was trying to shoot near him to scare him off with the gunshots." *Id.* at 561. He acknowledged that Bonet ran away once appellant started shooting; however, because he was still afraid that Bonet might kill him, he chased him down the street and continued shooting in Bonet's "general direction." *Id.* at 562. Appellant stated that he "was trying to shoot at the ground by him but not directly at him." *Id.* at 563.

{¶ 22} Appellant further admitted that he lied numerous times during his interview with Detective Gribi, including providing a false name and date of birth and stating that he left his house only after hearing one or two gunshots. He denied that he lied to Detective Gribi when he said he did not know Bonet had been shot, as, at the time, Bonet was on his back and, because it was dark, he could not see the gunshot wounds or any blood. Appellant acknowledged that after he was taken into custody, he admitted to the police that he "didn't know if [Bonet] had a gun or not." *Id.* at 571.

{¶ 23} At the close of all the evidence, appellant renewed his Crim.R. 29 motion for judgment of acquittal as to Counts 3, 4, and 5. The trial court reserved its ruling as to Count 3 but overruled the motion as to Counts 4 and 5.

{¶ 24} Following deliberations, the jury returned verdicts finding appellant guilty of Count 4 (purposeful murder)[2] and Count 5 (felony murder)[3] and the attached firearm specifications but not guilty of Count 3 (aggravated murder).

{¶ 25} At a sentencing hearing held immediately after the jury returned its verdicts, defense counsel made a motion for judgment of acquittal pursuant to Crim.R. 29(C) on Counts 4 and 5; the trial court denied the motion. The trial court merged Counts

---

[2] "Purposeful murder as charged in Count 4 is proscribed by R.C. 2903.02(A), which provides in relevant part that '[n]o person shall purposely cause the death of another.'" *Collins*, 2020-Ohio-3126, ¶24, n.2.

[3] "Felony murder as charged in Count 5 is prohibited by R.C. 2903.02(B), which states in relevant part that '[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 [voluntary manslaughter] or 2903.04 [involuntary manslaughter] of the Revised Code.' The underlying offense of violence supporting Count 5 was felonious assault in violation of R.C. 2903.11, a second-degree felony." *Collins*, 2020-Ohio-3126, ¶ 24, n.3.

6

> 4 and 5 for purposes of sentencing. In accordance with the state's election, the trial court sentenced appellant on Count 4. The court imposed a prison sentence of 15 years to life on Count 4, to be served consecutive to the three-year term of imprisonment mandated by R.C. 2941.145, for a total prison sentence of 18 years to life. The court memorialized the conviction and sentence in a judgment entry filed on May 21, 2019.

*State v. Collins*, 10th Dist. Franklin No. 19AP-373, 2020-Ohio-3126, ¶¶ 2-25 (May 28, 2020).

These facts are not in dispute.

Petitioner appealed to Ohio's Tenth District Court of Appeals, raising three assignments of error:

> I. IT WAS ERROR FOR THE LOWER COURT TO FAIL TO INSTRUCT THE JURY ON THE DEFENSE OF SELF DEFENSE THOUGH REQUESTED BY DEFENSE.
>
> II. IT WAS ERROR FOR THE COURT TO REFUSE TO INSTRUCT THE JURY ON THE "CASTLE" DOCTRINE.
>
> III. IT WAS INEFFECTIVE ASSISTANCE OF COUNSEL TO ALLOW CONTINUED USE OF THE WORD VICTIM BY THE STATE AND ITS WITNESSES AND FAIL TO REQUEST AN INSTURCTION ON VOLUNTARY MANSLAUGHTER.

(ECF No. 9, PageID 79.)  *Collins*, 2020-Ohio-3126, ¶ 26.  The court of appeals overruled his assignments of error and affirmed his convictions and sentence.  *Id*. at ¶ 62.

Petitioner appealed to the Supreme Court of Ohio, asking the court to review one proposition of law:

> Newly amended [Ohio Revised Code] 2901.05 only requires the presentation of evidence tending to support the use of self-defense to warrant a jury instruction and trigger the State's burden of persuasion regarding self-defense.

(ECF No. 9, PageID 191, 195.)  The Supreme Court of Ohio declined to accept jurisdiction over his appeal, with two justices dissenting.  (ECF No. 9, PageID 238.)  *State v. Collins*, 160 Ohio St. 3d 1419, 2020-Ohio-4811, 154 N.E.3d 102 (Oct. 13, 2020) (table).

Petitioner did not seek further review from the Supreme Court of the United States. (ECF No. 3, PageID 27.) He likewise did not file a petition seeking state post-conviction relief in the trial court. (ECF No. 3, PageID 27; ECF No. 9, PageID 256-257.)

On October 7, 2021, Petitioner signed and submitted his federal habeas corpus Petition to this Court, which was received and filed on October 19, 2021. (ECF No. 3, PageID 38.) He identifies three grounds for relief, which are discussed in detail below. Thereafter, Respondent filed the State Court Record, an Answer/Return of Writ to the Petition, and a supplement to the record. (ECF Nos. 9, 10, 11.) Petitioner did not file a reply to Respondent's Answer/Return of Writ. The matter is now ripe.

## II.    <u>LEGAL STANDARDS</u>

Because this is a habeas corpus case, provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. 104-132, 110 Stat. 1214, apply. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA limits the circumstances under which a federal court may grant a writ of habeas corpus with respect to any claim that was adjudicated on the merits in a state court proceeding. Specifically, under the AEDPA, a federal court shall not grant a writ unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). Section 2254(d)(1) circumscribes a federal court's review of claimed legal errors, while § 2254(d)(2) places restrictions on a federal court's review of claimed factual errors.

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal

courts, a state criminal defendant with federal constitutional claims is required to first present those claims to the state courts for consideration.  28 U.S.C. § 2254(b), (c); *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017).  More specifically, a petitioner must "fairly present" his claims to the state courts, including the state's highest court, before seeking federal habeas corpus review. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 845-48 (1999).  Fair presentment "requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review."  *Hicks v. Straub*, 377 F.3d 538, 552-53 (6th Cir. 2004) (quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)), *abrogated on other grounds by Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010) (en banc).  A petitioner must also do so in a way that gives the state courts a fair opportunity to rule on the federal law claims being asserted.  *See Coleman v. Thompson,* 501 U.S. 722, 731 (1991), *holding modified by Martinez v. Ryan*, 566 U.S. 1 (2012); *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984) ("In other words, the habeas petitioner must present his claim to the state courts as a federal constitutional issue—not merely as an issue arising under state law.").  It also means that if the claims are not presented to the state courts in the way in which state law requires, and the state courts therefore do not decide the claims on their merits, neither may a federal court.

If a prisoner fails to fairly present his claims to the state courts, but still has an avenue open to present the claims, then the petition is subject to dismissal for failure to exhaust state remedies.  *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (citing *Picard v. Connor*, 404 U.S. 270, 275-78 (1971)).  Where a petitioner has failed to exhaust claims but it appears that those claims would be barred if presented to the state courts, "there is a procedural default for purposes of federal habeas."  *Coleman,* 501 U.S. at 735 n.1.

Over time, the term "procedural default" has come to describe a situation where a person convicted of a crime in a state court fails (for whatever reason) to properly present a particular claim to the highest court of the state so that the state has a fair chance to correct any errors made during the trial or the appeal, before a federal court intervenes in the state criminal process. *See generally Robertson v. Fender*, No. 20-4215, 2021 WL 1978359, at *2 (6th Cir. Apr. 28, 2021) (citing *O'Sullivan,* 526 U.S. at 845, 847-48).  As the Supreme Court of the United States found in *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), "contentions of federal law which were not resolved on the merits in the state proceeding due to [the] failure to raise them there as required by state procedure" also cannot be resolved on their merits in a federal habeas case – that is, they are "procedurally defaulted."

It is well settled that "[a] common example of a procedural default is a failure to raise a claim in state court in a timely manner." *Gibbs v. Huss*, 12 F.4th 544, 550 (6th Cir. 2021).  A petitioner may also procedurally default a claim by failing to comply with state procedural rules when presenting such a claim. *Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006) (citing *Seymour v. Walker*, 224 F.3d 542, 549-50 (6th Cir. 2000) (citing *Wainwright,* 433 U.S. at 80)). In this situation, "[a] claim is procedurally defaulted if three conditions are met: (1) 'there is a state procedural rule with which the petitioner failed to comply;' (2) 'the state courts actually enforced the state procedural sanction;' and (3) the state procedural rule is 'an adequate and independent state procedural ground upon which the state could rely to foreclose review of a federal constitutional claim.'" *Avery v. Wainwright*, No. 20-3530, 2022 WL 1498431, at *7 (6th Cir. May 12, 2022) (quoting *Monzo v. Edwards*, 281 F.3d 568, 576 (6th Cir. 2002)); *McNeill v. Bagley*, 10 F.4th 588, 595 (6th Cir. 2021), *cert. denied sub nom. McNeill v. Shoop*, 142 S. Ct. 1377 (Mar. 21, 2022) (citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)).

A petitioner's procedural default may be excused, allowing a federal court to review his otherwise defaulted claim, if "the petitioner demonstrates 'that there was cause for his failure to follow the rule and that actual prejudice resulted from the alleged constitutional error.'" *Avery*, 2022 WL 1498431, at *7 (quoting *Monzo*, 281 F.3d at 576). The petitioner bears the burden of showing cause and prejudice. *Hinkle v. Randle*, 271 F.3d 239, 245 (6th Cir. 2001) (citing *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999)). A petitioner's pro se status, ignorance of the law, or ignorance of procedural requirements are insufficient bases to excuse a procedural default. *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004).

In addition, procedural default may also be excused where a petitioner is actually innocent. "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). To demonstrate actual innocence to excuse a procedural default, a petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

## III.  <u>PETITIONER'S CLAIMS</u>

Petitioner raises three grounds for relief before this Court. (Petition, ECF No. 3.) These grounds are, along with the facts alleged in support:

> **GROUND ONE:** PETITIONER IS BEING HELD IN VIOLATION OF HIS 5th, 6th AND 14th AMENDMENT RIGHT TO HAVE COUNSEL FOR HIS DEFENSE AND U. S. CONST. AMEND. XIV VIOLATION.
>
> Trial Court fail to applie [sic] new burden-shifting provision of the Self-defense Statute at trial, which changed Ohio's treatment of Self-defense claims thereby reducing his burden to raise the issue of Self-defense and place a burden of disproving the defense on the prosecution. Therefore, too - it was error for the lower Court to fail to instruct the jury on the defense of self-defense when asked[.]

(ECF No. 3, PageID 30.)

> **GROUND TWO:** THE COURT REFUSED TO INSTRUCT THE JURY ON THE "CASTLE" DOCTRINE VIOLATED DUE PROCESS OF LAW[.]
>
> It was error for the Court to fail to and refuse to instruct the jury on the castle doctrine. Thereby was a great likehood that the trial Court's application of an incorrect legal Standard prevented the introduction of evidence of an affirmative defense.

(ECF No. 3, PageID 31.)

> **GROUND THREE:** IT IS INEFFECTIVE ASSISTANCE WHEN COUNSEL FAIL TO REQUEST AN INSTRUCTION ON VOLUNTARY MANSLAUGHTER, AND TO ALLOW CONTINUED USE OF THE WORD VICTIM BY STATE.
>
> Counsel was ineffective in failing to object to the continued use of the word Victim by the state and its witnesses. References to Bonet as a victim allowed suggestion of a crime rather than a non crime of selfdefense. Counsel failed to request a jury instruction on voluntary manslaughter, and inadequately prepared him to testify.

(ECF No. 3, PageID 33.)

## IV.    <u>ANALYSIS</u>

Before considering the merits of Petitioner's habeas claims, the Court must first determine whether Petitioner has cleared certain procedural hurdles.  Respondent asserts that Petitioner has not, and that all of Petitioner's grounds for relief are barred by procedural default. The undersigned agrees.

### A.  Grounds One and Two – Jury Instructions

Petitioner initially frames Ground One in terms of the denial of the "right to have counsel for his defense."  (ECF No. 3, PageID 30.)  The facts supporting this ground, however, concern the trial court's failure to properly apply Ohio's amended self-defense statute and to instruct the jury on self-defense.  (*Id.*)  The undersigned thus construes Ground One to raise a jury instruction issue rather than a denial-of-counsel issue, as Petitioner was represented by counsel at

12

trial, on direct appeal, and in the Supreme Court of Ohio, and he does not challenge counsel's

performance with respect to the jury instruction issues.  (ECF No. 3, PageID 30-31, 36-37; ECF

No. 9, PageID 187-188, 190-199.)  Petitioner's second ground concerns the trial court's refusal

to instruct the jury about the so-called "castle doctrine," which can be relevant to a self-defense

instruction when the events happen in a criminal defendant's home, or "castle."  Petitioner asked

the trial court to give these instructions, and, after considering the parties' arguments, the trial

court declined to do so.  (ECF No. 9-3, PageID 848-869; ECF No. 9-4, PageID 883.)

The Tenth District Court of Appeals dealt with these jury instruction issues together,

rejecting both.  The court said:

> {¶ 27} Appellant's first and second assignments of error are interrelated and will
> be considered together. Appellant contends that the trial court erred in refusing to
> instruct the jury on self-defense and the castle doctrine. Appellant contends that he
> presented sufficient evidence, through his own testimony and that provided by
> Thompson, to merit a self-defense instruction. Regarding the castle doctrine,
> appellant contends the trial court "wrongly believed the Defendant-Appellant had
> a duty to retreat if he had a reasonable means of escape from the danger other than
> by the use of deadly force." (Appellant's Brief at 23.)

> {¶ 28} Generally, requested jury instructions should be provided ", 'if they are
> correct statements of the law, if they are applicable to the facts in the case, and if
> reasonable minds might reach the conclusion sought by the requested instruction.' "
> *State v. Kean*, 10th Dist. No. 17AP-427, 2019-Ohio-1171, ¶ 43, quoting *State v.
> Adams*, 144 Ohio St.3d 429, 2015-Ohio-3594, ¶ 240. However, "a court need not
> instruct the jury as a party requests if 'the evidence adduced at trial is legally
> insufficient' to support it." *State v. Juntunen*, 10th Dist. No. 09AP-1108, 2010-
> Ohio-5625, ¶ 13, quoting *State v. Barnd*, 85 Ohio App.3d 254, 259 (3d Dist.1993).
> *See also State v. Stewart,* 10th Dist. No. 12AP-527, 2013-Ohio-1463, ¶ 10 ("A trial
> court is not required to instruct a jury on an affirmative defense when the evidence
> is insufficient to support the instruction."). Ultimately, "[t]he trial court possesses
> the discretion 'to determine whether the evidence presented at trial is sufficient to
> require that [the] instruction be given.' " *Juntenen* at ¶ 13, quoting *State v. Lessin*,
> 67 Ohio St.3d 487, 494 (1993). Thus, when reviewing a trial court's refusal to
> submit a requested instruction to the jury, an appellate court considers whether that
> refusal constituted " 'an abuse of discretion under the facts and circumstances of
> the case.' " *Id.*, quoting *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989). An abuse of
> discretion is more than a mere error in law or judgment; it implies that the court's

decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶ 29} The trial court and counsel engaged in a lengthy colloquy regarding appellant's proposed jury instructions on self-defense and the castle doctrine. The trial court denied appellant's request, concluding that the evidence presented at trial did not support the instructions. Defense counsel objected and proffered a proposed self-defense instruction. (Defendant's Ex. Proffer Jury Instructions 1.) In its charge to the jury, the trial court averred that although there had been discussion of self-defense in the testimony and opening statement, the jury was not to consider self-defense and that such defense should not play a part in its deliberations. The court further admonished the jury not to speculate as to why self-defense had been removed from their consideration. (Tr. at 658.)

{¶ 30} The discussion between the trial court and counsel regarding the proposed instructions referenced the amended version of R.C. 2901.05. On March 28, 2019, approximately six weeks prior to appellant's trial, R.C. 2901.05 was amended to provide that when evidence presented at trial tends to support a claim that a defendant used force against another in self-defense, defense of another, or in defense of his or her residence, the state must prove beyond a reasonable doubt that the defendant did not act in self-defense, defense of another, or defense or his or her residence. R.C. 2901.05(B)(1). "The amended statute shifts the burden of proof on the affirmative defense of self-defense from the defendant to the prosecution, provided 'there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence.' " *State v. Tolle*, 4th Dist. No. 19CA1095, 2020-Ohio-935, ¶ 18, quoting R.C. 2901.05(B)(1). Prior to the amendment, R.C. 2901.05 placed the burden on the defendant to demonstrate that he or she acted in self-defense. *See* former R.C. 2901.05(A) ("The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense, is upon the accused.").

{¶ 31} R.C. 2901.05(B)(1), as amended, provides:
> A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

{¶ 32} In *State v. Carney*, 10th Dist. No. 19AP-402, 2020-Ohio-2691, this court very recently addressed the burden-shifting framework of R.C. 2901.05(B)(1) in the context of a sufficiency/manifest weight of the evidence claim. There, we

observed that prior to the enactment of R.C. 2901.05(B)(1), a defendant claiming self-defense was required to establish, by a preponderance of the evidence, that he or she (1) was not at fault in creating the situation giving rise to the affray, (2) had a bona fide belief that he or she was in imminent danger of death or great bodily harm and his or her only means of escape from such danger was the use of such force, and (3) did not violate any duty to retreat or avoid the danger. *Carney* at ¶ 30, citing *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus, and *State v. Howard*, 10th Dist. No. 16AP-226, 2017-Ohio-8742, ¶ 22.

{¶ 33} We further observed, however, that "revisions to the law enacted shortly before the trial of this case have placed the burden on the prosecution to disprove at least one of the elements of self-defense beyond a reasonable doubt." *Id.* at ¶ 31, citing R.C. 2901.05(B)(1). Applying those revisions, we concluded that "the prosecution was required to disprove self-defense by proving beyond a reasonable doubt that [the defendant] (1) was at fault in creating the situation giving rise to the affray, OR (2) did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, OR (3) did violate a duty to retreat or avoid the danger." *Carney*, citing R.C. 2901.05(B)(1) (emphasis sic), and *Robbins* at paragraph two of the syllabus.

{¶ 34} In the present case, the trial court averred that pursuant to the "new statute," (presumably a reference to R.C. 2901.05(B)(1)), a defendant is required to "produce some evidence * * * that tends to support the finding that the defendant used deadly force in self-defense or defense of his residence" and that "[i]f the defendant produces that evidence, the State must prove beyond a reasonable doubt the defendant did not use deadly force in self-defense or defense of the residence." (Tr. at 585-86.) Regarding the elements of a self-defense claim, the trial court averred that "[t]he defense has to offer evidence, if believed, that tends to establish" that he was not at fault in creating the situation giving rise to the affray, that he had reasonable grounds to believe that he was in imminent, immediate danger of death or great bodily harm and the only means of escape was the use of deadly force, and that he did not violate any duty to retreat or avoid the danger. *Id.* at 586-88. The court concluded that appellant had produced some evidence tending to establish only the first prong of his self-defense claim. Citing cases decided prior to the amendment to R.C. 2901.05, the trial court averred that "the case law is if the defendant fails to produce any evidence on any one of the elements, then you're not required to instruct the jury." *Id.* at 589. **Although this last statement arguably suggests that the trial court did not apply the burden-shifting framework of R.C. 2901.05(B)(1) in its analysis, no reversible error resulted, as the evidence presented at trial established that appellant was not entitled to a jury instruction on self-defense.**

{¶ 35} In *State v. Hubbard*, 10th Dist. No. 11AP-945, 2013-Ohio-2735, we addressed a scenario similar to that presented in the instant case. There, the defendant testified that he retrieved his weapon from inside his house, walked onto his front porch where he saw people approaching him from his front yard, and fired

his gun "to the side and down to warn them" to back up. *Id.* at ¶ 53. The defendant also stated that when he fired the shots, he did not intend to hurt or kill anyone. *Id.* Upon this evidence, the trial court refused the defendant's request for self-defense and castle doctrine jury instructions. We concluded that "[d]efendant's testimony that he did not fire his gun with the intention of harming anyone prevented defendant from claiming that he shot his gun in an attempt to repel force with force." *Id.* at ¶ 54. We reasoned:

> " 'By its terms, self-defense presumes intentional, willful use of force to repel force or to escape force.' " *State v. Johnson*, 10th Dist. No. 06AP-878, 2007-Ohio-2792, ¶ 41, * * * quoting *State v. Williams*, 1st Dist. No, C810450 (July 28, 1982). * * * **A defendant claiming self-defense "concedes he had the purpose to commit the act, but asserts that he was justified in his actions."** *State v. Barnd*, 85 Ohio App.3d 254, 260, 619 N.E.2d 518 (3d Dist.1993). **Thus, when an individual testifies that they did not intend to cause harm, such testimony prevents the individual from claiming self-defense.** * * * *State v. Herrington*, 9th Dist. No 25150, 2010-Ohio-6426, ¶ 13 (because the defendant testified that "he did not have the intent to shoot or kill during the incident," such testimony "was inconsistent with a claim of self-defense").

*Id.*

{¶ 36} In the instant case, appellant testified on direct examination that he fired the first shot "towards the ground" in order to "get [Bonet] away so I could run back inside my house and call the police." (Tr. at 545.) He further averred that after Bonet started running away, he fired three more shots to "get [Bonet] at least to the other side of Deshler, far enough for me to run back up through the middle of the houses and back inside the house through the back." *Id.* at 547. On cross-examination, he admitted that he intentionally fired his weapon four times in Bonet's direction; however, he denied that he was trying to shoot him. Rather, he "was trying to shoot near him to scare him off with the gunshots." *Id.* at 561. He also stated that he "was trying to shoot at the ground by him but not directly at him." *Id.* at 563. As in *Hubbard*, **appellant's testimony that he did not fire his gun with the intention of harming Bonet prevented him from claiming that he fired his gun in self-defense.**

{¶ 37} Appellant also contends the jury should have been given the additional instructions on self-defense as set forth in R.C. 2901.05(B)(2) and 2901.09(B). We disagree.

{¶ 38} R.C. 2901.05(B)(2) creates a rebuttable presumption that an accused acted in self-defense when using defensive force that is intended or likely to cause death or great bodily harm against a person who is in the process of unlawfully entering the accused's residence." As relevant here, "residence" includes "an attached porch." R.C. 2901.05(D)(2) and (3). "Thus, in Ohio, 'a person is presumed to have acted in self-defense,' and may use deadly force, 'when attempting to expel or

16

expelling another from their home who is unlawfully present.' " *Hubbard* at ¶ 52, quoting *State v. Johnson,* 8th Dist. No. 92310, 2010-Ohio-145, ¶ 18.

{¶ 39} R.C. 2901.09(B) codifies specific circumstances under which a person has no duty to retreat and states: "For purposes of any section of the Revised Code that sets forth a criminal offense, a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence." Thus, pursuant to R.C. 2901.09(B), there is no duty to retreat before using defensive force when a person is attacked in his or her own home. *State v. Darby*, 10th Dist. No. 10AP-416, 2011-Ohio-3816, ¶ 36, citing *State v. Williford*, 49 Ohio St.3d 247 (1990). "While under most circumstances a person may not use deadly force if he or she has available a reasonable means of retreat from the confrontation, ' "[w]here one is assaulted in his home, or the home itself is attacked, he may use such means as are necessary to repel the assailant from the house, or to prevent his forcible entry, or material injury to his home, even to the taking of life." ' " *Id.*, quoting *State v. Peacock*, 40 Ohio St. 333, 334 (1883).

{¶ 40} **This court has interchangeably referred to the former version of R.C. 2901.05(B)(1) and 2901.09(B) as the "castle doctrine."** *See Darby* at ¶ 33; *Hubbard* at ¶ 51, respectively. The "castle doctrine" derives from the tenet that one's home is one's castle and one has a right to protect it and those within it from intrusion or attack. *Id.* **Appellant maintains that because he was attacked while seated on the front porch of his residence, the jury should have been instructed that he was presumed to have acted in self-defense and had no duty to retreat before using deadly force against Bonet.**

{¶ 41} Initially, we note that **appellant's own testimony belies his argument**. As noted above, appellant testified that he did not shoot directly at Bonet and did not intend to shoot him. Rather, he only shot at the ground near Bonet or in Bonet's direction in order to drive him away from his house.

{¶ 42} Furthermore, the evidence presented in the instant case does not support an instruction under either R.C. 2901.05(B)(2) or 2901.09(B). Appellant testified that he believed Bonet had a gun in his pocket during the altercation and robbery that occurred on the front porch. He further testified that he fired one shot from his front porch after Bonet robbed him. However, the video footage contradicts this testimony. Indeed, the video footage demonstrates that appellant fired all four shots from behind Bonet as he was running down the street away from appellant. Moreover, **even if appellant fired the first shot from his front porch, any threat of imminent danger abated once Bonet began running away from the house.** Although appellant testified that he was not shooting at Bonet, the shots he fired struck Bonet in the back of his body. Indeed, the autopsy revealed that Bonet suffered three penetrating gunshots wounds to the back of his body. Under the circumstances, there was no justification for continuing to fire shots in Bonet's direction as he was running away from appellant's house. *See Darby* at ¶ 42 ("There was no justification presented here for continuing to shoot Ms. Mankins in the back

as she attempted to run away."). *See also State v. Butler*, 10th Dist. No. 84AP-60 (July 11, 1985) ("[t]he purported claim of self-defense asserted at trial does not bear scrutiny in view of the shooting in the back of a victim moving away from the armed appellant"); *State v. Johnson*, 6th Dist. No. L-08-1325, 2009-Ohio-3500 (there are limitations to the application of self-defense; it is not available unless the defendant demonstrates that the force used to repel the danger was no more than reasonably required by the circumstances, and it is not applicable if the force used is so grossly disproportionate to the danger so as to demonstrate revenge or an evil purpose; if the accused uses a greater degree of force than is necessary under the circumstances, the conduct is not justifiable on the grounds of self-defense).

{¶ 43} For the reasons outlined above, we conclude that **the evidence presented at trial was insufficient to support a jury instruction on self-defense or the castle doctrine.** Accordingly, the trial court did not abuse its discretion in failing to so instruct the jury.

{¶ 44} Appellant's first and second assignments of error are overruled.

*State v. Collins*, 10th Dist. Franklin No. 19AP-373, 2020-Ohio-3126, ¶ 27-44 (May 28, 2020) (emphases added).

Petitioner unsuccessfully sought further review in the Supreme Court of Ohio. *State v. Collins*, 160 Ohio St. 3d 1419, 2020-Ohio-4811, 154 N.E.3d 102 (Oct. 13, 2020) (table). Respondent argues here that these grounds were not fairly presented in that attempt, and are therefore procedurally defaulted. (ECF No. 10, PageID 954-955.)

As noted above, "[a] petitioner may procedurally default a claim by failing to raise it in state court and pursue it through the state's 'established appellate review process.'" *Owens v. Perry*, No. 19-6405, 2020 WL 7315915, at *2 (6th Cir. July 16, 2020) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). The doctrine "applies to bar a federal court's review of a state prisoner's federal claim where that prisoner failed to give the state courts a 'full and fair' opportunity to resolve that claim . . . and the prisoner cannot cure that failure because state-court remedies are no longer available." *Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004). "A full and fair presentation of the claim requires the petitioner to 'present his claim to the state courts

18

as a federal constitutional issue—not merely as an issue arising under state law.'" *Owens*, 2020 WL 7315915, at *2 (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984) and citing *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006)).  And, "it does not suffice to only present the claim to a state trial court; rather, the petitioner must raise the claim in state court and 'pursue [it] through the state's ordinary appellate review procedures.'" *Nian v. Warden, N. Cent. Corr. Inst.*, 994 F.3d 746, 756 (6th Cir. 2021) (quoting *Thompson v. Bell*, 580 F.3d 423, 437 (6th Cir. 2009)).  This means that the claim must be fairly presented at every stage of the state appellate process, including to the state's highest court.  *Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir. 2009); *O'Sullivan*, 526 U.S. at 845.

In his pro se habeas Petition, Petitioner submits that he raised the jury instruction issues in state court.  (ECF No. 3, PageID 30-31, 36 (checking the boxes to indicate that he "raise[d] the issue[s] on direct appeal" and "presented [them] to the highest state court having jurisdiction").)  His brief before the Tenth District Court of Appeals reflects that he did so at that level.  (*See* ECF No. 9, PageID 86-99, citing, *inter alia, United States v. Mathews*, 485 U.S. 58, 63 (1988)[4] and *Taylor v. Withrow*, 288 F.3d 846, 851 (6th Cir. 2002).[5])  Respondent asserts that when Petitioner sought further review from the Supreme Court of Ohio, he did so only on his first jury instruction issue, and only on state-law grounds.  (ECF No. 10, PageID 954-955.)  The undersigned agrees.

First, when indicating in his notice of appeal what sort of jurisdictional appeal he was filing to the Supreme Court of Ohio, Petitioner did not assert that "[t]he case involves a

---

[4] In *Mathews*, the United States Supreme Court said:  "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."

[5] In *Taylor,* the Sixth Circuit said:  "the right of a defendant in a criminal trial to assert self-defense is one of those fundamental rights, and that failure to instruct a jury on self-defense when the instruction has been requested and there is sufficient evidence to support such a charge violates a criminal defendant's rights under the due process clause."

substantial constitutional question," but instead that it "raise[d] issues of public and great general interest."  (ECF No. 9, PageID 187-188.)  *See* Ohio S.Ct.Prac.R. 5.02(A) (defining types of jurisdictional appeals) and 7.01(B)(1)(d) (requiring a notice of appeal to identify what type of jurisdictional appeal it is).  Although Petitioner alleged in his Memorandum in Support of Jurisdiction ("Jurisdictional Memorandum") that the case involved a substantial constitutional question (ECF No. 9, PageID 192), nothing in the memorandum discussed, or even identified, that question.

Instead, Petitioner argued that the court should accept the appeal to provide guidance on Ohio's newly-amended self-defense statute, Ohio Revised Code § 2901.05(B)(1).  (Jurisdictional Mem., ECF No. 9, PageID 192 ("This Court should accept jurisdiction of this case to provide needed clarity to lower courts as they struggle to interpret the new self-defense law. . . . Since the amendment to R.C. 2901.05(B)(1) became effective, lower courts have struggled to interpret the law, resulting in inconsistent decisions.") and PageID 195-197 ("Courts have reached inconsistent decisions on whether to give the jury a self-defense instruction.").)  He raised one proposition of law concerning what the new Ohio statute required:  "Newly amended [Ohio Revised Code] 2901.05 only requires the presentation of evidence tending to support the use of self-defense to warrant a jury instruction and trigger the State's burden of persuasion regarding self-defense."  (ECF No. 9, PageID 195.)  His memorandum compared cases where state trial courts gave, or did not give, an instruction on self-defense, and discussed how much evidence defendants were required to present before the jury was instructed on the state's new statutory burden of persuasion.  (ECF No. 9, PageID 195-197.)

With respect to Petitioner's own case, he argued:

[T]he Tenth District held that a self-defense instruction can still be denied if the trial court believes the defendant failed to provide evidence on all the elements of

> a self-defense claim, even when the defendant provides evidence that tends to
> support self-defense. *State v. Collins*, 10th Dist. Franklin No. 19AP-373, 2020-
> Ohio-3126, ¶ 34. The trial court, referencing cases decided prior to the amendment,
> determined "the case law is if the defendant fails to produce any evidence on any
> one of the elements, then you're not required to instruct the jury." *Id*. The appellate
> court recognized the trial court may not have applied the new burden shifting, but
> concluded this was harmless. *Id*. The court failed to holistically analyze whether
> Mr. Collins introduced some evidence which "tends to support" a self-defense jury
> instruction. The evidence introduced by Mr. Collins tends to support a self-defense
> jury instruction and more closely aligns with [the state court cases of] *Jackson*,
> *Williams*, and *White*.[6] It is clear that courts are inconsistently determining a
> defendant's burden of production with regards to evidence that "tends to support"
> self-defense.

(ECF No. 9, PageID 197.)  His specific argument was that "the trial court misinterpreted Mr.

Collins's burden of production and the State's burden," not under federal constitutional

principles, but under the new state statutory language.  (*Id*. at PageID 197 (referring to the

legislative history of the amended statute) and PageID 198 (arguing that "the court of appeals

held Mr. Collins to a more stringent standard of production than required *under the newly

amended R.C. 2901.05*") (emphasis added).)  All of this argument focused on and invoked state

law, rather than federal constitutional law.

As noted above, the federal court cannot consider, in habeas corpus proceedings, claims

that were not "fairly presented" to the state courts on federal constitutional grounds.  *McMeans v.

Brigano*, 228 F.3d 674, 681 (6th Cir. 2000); *Koontz*, 731 F.2d 365, 368 (6th Cir. 1984).  The

Sixth Circuit has said that:

> In order to meet the fair-presentment requirement, a petitioner must "assert[ ] both
> the factual and legal basis for his claim to the state courts." [*McMeans*, 228 F.3d at
> 681]. This requirement may be met in four ways: "(1) reliance upon federal cases
> employing constitutional analysis; (2) reliance upon state cases employing federal
> constitutional analysis; (3) phrasing the claim in terms of constitutional law or in
> terms sufficiently particular to allege a denial of a specific constitutional right; or
> (4) alleging facts well within the mainstream of constitutional law." *Id*.

---

[6] Petitioner was referring to *State v. Williams*, 9th Dist. Summit No. CV29444, 2020-Ohio-3269; *State v. Jackson*, 8th Dist. Cuyahoga No. 108493, 2020-Ohio-1606; and *State v. White*, 12th Dist. Butler No. CA2019-07-118, 2020-Ohio-3313.

*Johnson v. Jenkins*, No. 16-4076, 2017 WL 4317147, at *2 (6th Cir. Apr. 27, 2017). "General allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present claims' that specific constitutional rights were violated." *Harris v. Booker*, 251 F. App'x 319, 322 (6th Cir. 2007) (quoting *McMeans*, 228 F.3d at 681).

Here, Petitioner did not even generally argue before the Supreme Court of Ohio that his rights under the federal Due Process Clause had been violated, did not cite to the United States Constitution or to any federal cases in making his arguments, did not rely on any state cases using federal constitutional analysis, and did not allege facts well within the mainstream of federal constitutional law. He therefore has failed to fairly present Ground One to Ohio's highest court. *See Bushner v. Larose*, No. 5:14-cv-385, 2017 WL 1199160, at *8 (N.D. Ohio Mar. 31, 2017) (concluding that petitioner did not satisfy the *McMeans* standard when he presented only a general assignment of error alleging that the trial court's failure to give proper jury instructions on self-defense and the castle doctrine was reversible and plain error); *Hogg v. Warden Corr. Reception Ctr.*, No. 14-3489, 2015 WL 13928540, at *2 (6th Cir. Feb. 25, 2015) (citing *McMeans,* 228 F.3d at 681) (affirming a district court's determination that petitioner failed to fairly present his jury instruction argument concerning the castle doctrine to the state courts, where he had only argued that the trial court erred in finding the victim entered his house lawfully, precluding the doctrine's application).

Turning to Ground Two, the undersigned finds that Petitioner has likewise failed to fairly present it to the highest state court. Unlike Ground One, Petitioner did not ask the Supreme Court of Ohio to review the trial court's refusal to instruct the jury on the castle doctrine. His Jurisdictional Memorandum noted the refusal (ECF No. 9, PageID 193, 194), but did not make

an argument, constitutional or otherwise, that the Supreme Court of Ohio should address the issue in a further appeal.

Petitioner's direct appeal of his conviction and sentence is concluded, and the judgment against him has become final. Petitioner has no remaining state court avenues in which to "fairly present" these on-the-record jury instruction issues to the Ohio courts. *See Engle v. Isaac*, 456 U.S. 107, 125, n.28 (1982) (as self-defense instruction could be challenged on direct appeal, it could not be challenged on collateral review). Because he failed to do so, Grounds One and Two are procedurally defaulted and cannot be reviewed by the Court.

Petitioner does not acknowledge or attempt to excuse this procedural default. In his Petition, he instead indicates that all his grounds for relief have "been presented to the highest state court having jurisdiction." (*See* ECF No. 3, PageID 36 (leaving blank the follow-up questions about why they were not).) And, as noted above, he did not file a reply to Respondent's Answer/Return of Writ attempting to demonstrate "that there was cause for his failure to follow the rule and that actual prejudice resulted from the alleged constitutional error." *Monzo v. Edwards*, 281 F.3d 568, 576 (6th Cir. 2002). The undersigned therefore concludes that Petitioner has not satisfied his burden to show that his procedural default should be excused.

To the extent that Petitioner might argue, or his Petition may suggest, that he is "actually innocent" and that failure to excuse his procedural default will result in a manifest injustice, the undersigned notes that the Petition does not point to new reliable evidence that was not presented at trial to support such a claim. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Petitioner here does not challenge the facts described in the state court decisions; he instead argues that the decisions were legally incorrect. Because has not presented any reliable new evidence showing his actual innocence, he has not met the high bar for this extraordinary exception.

23

Finally, for completeness, the undersigned notes that the Sixth Circuit recently rejected, on the merits, a similar claim that relied in part on the same federal cases Petitioner has cited. In *Keahey v. Marquis*, 978 F.3d 474 (6th Cir. 2020), *cert. denied*, 142 S. Ct. 69 (2021), the petitioner filed a § 2254 habeas petition, arguing that "the state court violated his Sixth and Fourteenth Amendment rights by refusing to instruct the jury on self-defense." *Id*. at 477. The Sixth Circuit affirmed the dismissal of the petition, finding that the trial court's refusal to give the instruction was not contrary to clearly established Supreme Court precedent nor an unreasonable application of clearly established federal law. The Court, focusing on the high legal standards, said:

> *Contrary to federal law*. Keahey has picked a difficult hill to climb in claiming the jury instruction ruling was "contrary to federal law." It makes no difference whether the jury instruction misread state law because federal habeas applies only to convictions that offend "the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68, 71–72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). That means he must show that the trial judge not only misread state law but also misread it so badly that it violated the Sixth and Fourteenth Amendments. That's not easy because "instructional errors of state law generally may not form the basis for federal habeas relief." *Gilmore v. Taylor*, 508 U.S. 333, 344, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993). Even after that, he must show that such a botched interpretation violated clearly established United States Supreme Court decisions. And even then, he still must show that the mistake violated concrete Supreme Court holdings, *Marshall v. Rodgers*, 569 U.S. 58, 61, 133 S.Ct. 1446, 185 L.Ed.2d 540 (2013), not generalized principles, *Woods v. Donald*, 575 U.S. 312, 318, 135 S.Ct. 1372, 191 L.Ed.2d 464 (2015).

> Keahey claims that two lines of cases help him. But neither one contains a holding on point that the state appellate court violated. Start with *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986). It ruled that "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense," whether that right is "rooted directly in the Due Process Clause of the Fourteenth Amendment, ... or in the Compulsory Process or Confrontation clauses of the Sixth Amendment." *Id.* at 690, 106 S.Ct. 2142 (quotation omitted). Defendants have used the principle to raise claims based on inconsistent jury instructions, *see Stevenson v. United States*, 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980 (1896), a capital defendant's right to a lesser included offense instruction, *see Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the exclusion of evidence, *see Holmes v. South Carolina*, 547 U.S. 319, 126 S.Ct. 1727,

164 L.Ed.2d 503 (2006), access to evidence, *see California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), and the testimony of defense witnesses, *see Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972). But the Court has never invoked this principle to "squarely establish[ ]" a federal right to a self-defense instruction. *Knowles v. Mirzayance*, 556 U.S. 111, 122, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009).

Move to *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). It establishes a narrow category of state jury-instruction mistakes that violate the clearly established right to "fundamental fairness." *Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (quotation omitted); *Frey v. Leapley*, 931 F.2d 1253, 1255 (8th Cir. 1991); *Armstrong v. Bertrand*, 336 F.3d 620, 626 (7th Cir. 2003). To fit the theory, the state court's refusal to give the instruction must have "so infected the entire trial that the resulting conviction violates due process." *Cupp*, 414 U.S. at 147, 94 S.Ct. 396. But the Supreme Court, regrettably for Keahey, has never invoked this principle in granting relief for the failure to give a self-defense instruction.

In the face of these precedents, Keahey has not shown that the state appellate court's decision was "contrary to" clearly established Supreme Court precedent. It neither "appl[ied] a rule that contradicts the governing law set forth in [Supreme Court] cases" nor arrived at a different conclusion after "confront[ing] a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (quotation omitted).

*Unreasonable application of federal law*. Keahey does not do any better under the "unreasonable application" prong of AEDPA. That, too, is "difficult to meet." *Greene v. Fisher*, 565 U.S. 34, 38, 132 S.Ct. 38, 181 L.Ed.2d 336 (2011) (quotation omitted). A "federal habeas court may not [grant relief] simply because [it] concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously." *Williams v. Taylor*, 529 U.S. 362, 411, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In "assessing whether a state court's application of federal law is unreasonable, the range of reasonable judgment can depend in part on the nature of the relevant rule that the state court must apply." *Renico v. Lett*, 559 U.S. 766, 776, 130 S.Ct. 1855, 176 L.Ed.2d 678 (2010) (quotation omitted). Both of the relevant standards in this instance—that a criminal defendant is guaranteed the opportunity to present a defense and that the trial must comport with fundamental fairness—lack "specificity." *Harrington*, 562 U.S. at 101, 131 S.Ct. 770. That left the state courts with considerable "leeway" when deciding whether to submit the charge to the jury. *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).

Gauged by these modest requirements, the Ohio court of appeals' decision passes. It did not unreasonably apply either of the two relevant Supreme Court holdings in declining to instruct on self-defense. To our knowledge, the Court has

discussed the denial of a state self-defense instruction in the context of constitutional rights only once—as a hypothetical possibility and in a dissent no less. *Gilmore*, 508 U.S. at 359, 113 S.Ct. 2112 (Blackmun, J., dissenting). The *Gilmore* majority rejected the argument that "the right to present a defense includes the right to have the jury consider it" because "such an expansive reading of our cases would make a nullity of the rule ... that instructional errors of state law generally may not form the basis for federal habeas relief." *Id.* at 344, 113 S.Ct. 2112; *White v. Woodall*, 572 U.S. 415, 427, 134 S.Ct. 1697, 188 L.Ed.2d 698 (2014).

**Because the Supreme Court has never clearly established Keahey's alleged constitutional right to a self-defense instruction and because the state court did not unreasonably apply the most relevant Supreme Court holdings, he has no basis for habeas relief under § 2254(d)(1)**. In rejecting a similar claim, the Seventh Circuit put it this way: Declining to grant a request to "present a state-created, not federally required, defense is, as a first approximation anyway, at worst merely to make an error of state law; and if there is one fixed star in the confusing jurisprudence of constitutional criminal procedure, it is that a violation of state law does not violate the Constitution." *Eaglin v. Welborn*, 57 F.3d 496, 501 (7th Cir. 1995) (en banc); *see also Engle v. Isaac*, 456 U.S. 107, 120-21, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *Nickerson v. Lee*, 971 F.2d 1125, 1137-38 (4th Cir. 1992). And as our court has put it in the evidentiary context: A "habeas petitioner's challenge to an 'evidentiary ruling' cannot satisfy § 2254(d)(1) unless the petitioner identifies 'a Supreme Court case establishing a due process right with regard to [the] *specific kind of evidence*' at issue." *Stewart v. Winn*, 967 F.3d 534, 538 (6th Cir. 2020) (quotation omitted).

By what measure anyway would federal courts gauge whether the state criminal defendant introduced enough evidence to have a federal right to a self-defense instruction? Would it be a "mere scintilla" of evidence supporting the defendant's theory? *See United States v. Morton*, 999 F.2d 435, 437 (9th Cir. 1993) (quotation omitted). Adequate evidence to raise a factual question for a reasonable jury? *See United States v. Branch*, 91 F.3d 699, 712 (5th Cir. 1996). Would "*some* evidence" do the trick? *See United States v. Scout*, 112 F.3d 955, 960 (8th Cir. 1997). No clearly established Supreme Court precedent gives an answer, confirming that the state courts did not unreasonably apply the relevant precedent.

Keahey offers several arguments in response, each unpersuasive. He starts with a precedent of our own, ***Taylor v. Withrow***, which said that federal law guarantees a criminal defendant the right to a self-defense jury instruction "when the instruction has been requested" and "there exists evidence sufficient for a reasonable jury to find in his favor." 288 F.3d 846, 851-53 (6th Cir. 2002) (quotation omitted). But as it happens, the habeas claimant did not obtain relief in the case, making this language unnecessary to the decision. *See Freeman v. Wainwright*, 959 F.3d 226, 230 (6th Cir. 2020). **Our court has treated *Taylor*'s language as nonbinding dicta** over, *Newton v. Million*, 349 F.3d 873, 879 (6th

Cir. 2003), and over, *Phillips v. Million*, 374 F.3d 395, 397-98 (6th Cir. 2004). No doubt some unpublished opinions treated *Taylor*'s language as a holding, even as they denied habeas relief. *See Horton v. Warden, Trumbull Corr. Inst.*, 498 F. App'x 515, 522 n.2 (6th Cir. 2012); *Neal v. Booker*, 497 F. App'x 445, 451 (6th Cir. 2012). But the paper of unpublished decisions cannot escape the scissors of published decisions on point.

Making matters more difficult for Keahey, the Supreme Court has been more explicit in its interpretation of "clearly established Federal law" since *Taylor*. *Woods*, 575 U.S. at 317-18, 135 S.Ct. 1372; *Lopez v. Smith*, 574 U.S. 1, 5-7, 135 S.Ct. 1, 190 L.Ed.2d 1 (2014). What *Taylor* said then could not satisfy AEDPA today. It noted that "[t]here is no Supreme Court decision unmistakably setting down th[e] precise rule" over what to do with a denied self-defense instruction under state law. *Taylor*, 288 F.3d at 852. A point of law on which "no Supreme Court decision" exists is not the kind of claim that the Court welcomes today. "[T]he Sixth Circuit's reliance on its own precedents [cannot] be defended ... on the ground that they merely reflect what has been clearly established by our cases." *Parker v. Matthews*, 567 U.S. 37, 49, 132 S.Ct. 2148, 183 L.Ed.2d 32 (2012) (quotation omitted).

Reliance on sister circuit decisions meets a similar fate. *See Lannert v. Jones*, 321 F.3d 747, 754 (8th Cir. 2003); *Bradley v. Duncan*, 315 F.3d 1091, 1098 (9th Cir. 2002); *Hagenno v. Yarborough*, 253 F. App'x 702, 704 (9th Cir. 2007). For "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by th[e] [Supreme] Court." *Knowles*, 556 U.S. at 122, 129 S.Ct. 1411 (quotation omitted). Circuit precedent cannot "constitute clearly established Federal law, as determined by the Supreme Court." *Glebe v. Frost*, 574 U.S. 21, 24, 135 S.Ct. 429, 190 L.Ed.2d 317 (2014) (quotation omitted); *Smith v. Cook*, 956 F.3d 377, 391 (6th Cir. 2020).

***Mathews v. United States***, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988), doesn't advance Keahey's cause either. While it says that "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor," *id.* at 63, 108 S.Ct. 883, Keahey overlooks the reality that *Mathews* is not a constitutional case, *id.* at 66, 108 S.Ct. 883. The Court directly reviewed a district court's interpretation of federal common law, holding that a federal defendant "is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment." *Id.* at 62, 108 S.Ct. 883. That is a world of difference from a habeas challenge to a state court decision. **The Court has never applied** ***Mathews*** **to any defense besides an entrapment defense**, *see Hardy v. Maloney*, 909 F.3d 494, 500 (1st Cir. 2018), **and it has never invoked the decision to overrule a state court ruling on habeas**.

27

*Keahey,* 978 F.3d at 478-81 (emphasis added).  Had Petitioner here not procedurally defaulted

Grounds One and Two, his claims therein—based on *Mathews v. United States* and *Taylor v.*

*Withrow* in the state court—would likely meet a similar result.

Grounds One and Two must therefore be **DENIED**.

### B.  Ground Three – Ineffective Assistance of Counsel

In Ground Three, Petitioner asserts that his trial counsel provided ineffective assistance in

three respects:  1) he failed to request a jury instruction on voluntary manslaughter, 2) he failed

to object to the continued use of the word "victim" with respect to the deceased, DeSean Bonet,

and 3) he failed to adequately prepare Petitioner to testify.  (ECF No. 3, PageID 33.)  Petitioner

raised these arguments on direct appeal to the Tenth District Court of Appeals.  (ECF No. 9,

PageID 79, 99-105.)  *State v. Collins*, 10th Dist. Franklin No. 19AP-373, 2020-Ohio-3126, ¶¶ 26,

45 (May 28, 2020).  That court rejected them:

> {¶ 45} In his third assignment of error, appellant contends that his trial counsel was
> ineffective in failing to: (1) request a jury instruction on voluntary manslaughter,
> (2) object to the continued use of the word "victim" by the state and its witnesses,
> and (3) adequately prepare him to testify. We disagree with all three assertions.

> {¶ 46} "The Sixth Amendment to the United States Constitution guarantees a
> criminal defendant the effective assistance of counsel." *State v. Belmonte,* 10th
> Dist. No. 10AP-373, 2011-Ohio-1334, ¶ 8, citing *McMann v. Richardson,* 397 U.S.
> 759, 771 (1970). Courts employ a two-step test in determining whether the right to
> effective assistance of counsel has been violated. *Id.*, citing *Strickland v.
> Washington*, 466 U.S. 668, 687 (1984). The defendant must first demonstrate that
> counsel's performance was deficient. To so demonstrate, the defendant must show
> that counsel made errors so serious that counsel was not functioning as the
> "counsel" guaranteed by the Sixth Amendment. *Id.* The defendant must then
> demonstrate that the deficient performance prejudiced the defense. To do so, the
> defendant must prove that counsel's errors were so serious that the defendant was
> deprived of a fair trial, i.e., a trial whose result is reliable. *Id.*, citing *Strickland* at
> 687. A defendant's failure to prove either part of the test makes it unnecessary for
> a court to consider the other part. *State v. Richardson*, 10th Dist. No. 18AP-310,
> 2019-Ohio-3490, ¶ 22, citing *Strickland* at 697-98.

{¶ 47} In Ohio, a properly licensed attorney is presumed to be competent. *Belmonte* at ¶ 8. Thus, in demonstrating deficient performance, the defendant must overcome the strong presumption that counsel's performance was adequate. *Id.* at ¶ 9, citing *State v. Smith*, 17 Ohio St.3d 98, 100 (1985). In demonstrating prejudice, the defendant must prove that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.*, citing *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus. "A verdict adverse to a criminal defendant is not of itself indicative that he received ineffective assistance of trial counsel." *In re J.J.A.*, 10th Dist. No. 09AP-242, 2010-Ohio-672, ¶ 14, citing *State v. Hester*, 45 Ohio St.2d 71, 75 (1976).

{¶ 48} We first address appellant's contention that his trial counsel was ineffective in failing to request a jury instruction on voluntary manslaughter. R.C. 2903.03(A) defines voluntary manslaughter and states in part: "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another."

{¶ 49} Voluntary manslaughter is "an inferior degree of murder." *State v. Rhodes*, 63 Ohio St.3d 613, 617 (1992). Although "voluntary manslaughter is not a lesser included offense of murder, the test for whether a judge should give a jury an instruction on voluntary manslaughter when a defendant is charged with murder is the same test to be applied as when an instruction on a lesser included offense is sought." *State v. Shane*, 63 Ohio St.3d 630, 632 (1992). "Thus, a defendant charged with murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter." *Id.* However, "[a]n instruction is not warranted simply because the defendant offers 'some evidence' going to the lesser included [or inferior degree] offense." *State v. Gray,* 12th Dist. No. CA2010-03-064, 2011-Ohio-666, ¶ 23, citing *Shane* at 632-33. Instead, "[t]here must be 'sufficient evidence' to 'allow a jury to *reasonably* reject the greater offense and find the defendant on a lesser included (or inferior-degree) offense.' " (Emphasis sic.) *Id.*, quoting *Shane* at 632-33.

{¶ 50} The test for voluntary manslaughter includes objective and subjective components. *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 153. Regarding the objective component, "a fact-finder must determine whether a serious provocation occurred and whether that provocation was 'sufficient to arouse the passions of an ordinary person beyond the power of his or her control.' " *Id.*, quoting *Shane* at 635. As to the subjective component, "the fact-finder must evaluate whether 'this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage.' " *Id.*, quoting *Shane* at 634. A defendant being tried for murder must prove the mitigating circumstances of R.C.

2903.03(A) "by a preponderance of the evidence." *Thompson* at ¶ 153, citing *Rhodes* at 620.

{¶ 51} This court has observed that **"[s]elf-defense on the one hand requires a showing of fear, whereas voluntary manslaughter requires rage."** *State v. Thompson,* 10th Dist. No. 92AP-1124 (Feb. 23, 1993). Moreover, "[w]hen analyzing the subjective prong of the test, '[e]vidence supporting the privilege of self-defense, i.e., that the defendant feared for his own personal safety, does not constitute sudden passion or fit of rage.' " *State v. Harding*, 2d Dist. No. 24062, 2011-Ohio-2823, ¶ 43, quoting *State v. Stewart,* 10th Dist. No. 10AP-526, 2011-Ohio-466, ¶ 13.

{¶ 52} Here, even assuming the objective prong was satisfied, the evidence presented by appellant fails to satisfy the subjective prong. Although appellant's testimony established that Bonet robbed him, such evidence was insufficient to establish that he acted under the influence of sudden passion or fit of rage warranting an instruction on voluntary manslaughter. Appellant did not assert that he was enraged or even angered by either the altercation or the robbery. Rather, he testified that he was "nervous" and "scared" and "excited" and "feared for [his] life" during the incident. (Tr. at 544.) "[F]ear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." *State v. Mack*, 82 Ohio St.3d 198, 201. Thus, in considering the subjective standard, **appellant's own testimony failed to support, and actually undermined, any claim that he acted out of sudden passion or fit of rage.** *See State v. Collins*, 97 Ohio App.3d 438, 446 (8th Dist.1994). **Accordingly, appellant was not entitled to an instruction on voluntary manslaughter, and trial counsel's failure to request such an instruction does not constitute ineffective assistance of counsel**.

{¶ 53} Next, appellant claims that defense counsel was ineffective in failing to object to the continued use of the word "victim" by the state and its witnesses. Review of the state's questioning of law enforcement witnesses reveals multiple references to Bonet as a "victim." Appellant argues that such testimony "virtually allows opinions from police witnesses in a self defense case [and] suggests a crime rather than a non crime of self-defense and thus was opinion testimony from non experts in that specific defense." (Appellant's Brief at 30.)

{¶ 54} As the state notes in its brief, the record indicates that defense counsel raised an objection to use of the term "victim," albeit in a sidebar that was not specifically memorialized on the record. During the parties' presentation of a stipulation regarding Bonet's identity, the trial court told the jury:

> The Court: All right. Next stipulation would be sometimes we would call a witness to identify the victim. The defense and the prosecution are stipulating and agreeing that the autopsy was performed on and the photos are photos of the victim, Mr. Bonet, in this case.

(Tr. 512-13.)

{¶ 55} Thereafter, defense counsel asked to approach the bench. A discussion ensued that was not made part of the record. Immediately after going back on the record, the trial court instructed the jury as follows:

> The Court: All right. So the stipulation is as follows: The person named in the indictment is Desean Bonet, and those were the photographs. He is the deceased. I think that covers that.
>
> And, you know, there's been references through the trial about "victim." Certainly, he was shot; he's dead. But he's not necessarily a victim, you know, depending on what your findings are, so don't draw any inference because I said "victim" or other people said "victim."
>
> You're the ones that are the final arbiters of what happened and whether a crime occurred.
>
> Anything additional for the record on that issue?
>
> [Defense Counsel]: No, Your Honor. Thank you.

(Tr. 513-14.)

{¶ 56} **This exchange makes clear that defense counsel objected to the term "victim" as used by the trial court during the stipulation.** The trial court then instructed the jury that it was not to draw any inference from past use of the term "victim" by the court, the prosecutors, or the state's witnesses. Appellant fails to explain what other steps defense counsel could have taken regarding this issue. Indeed, defense counsel's objection resulted in the trial court's issuance of a curative instruction. "As an appellate court, we must presume that the jury followed the trial court's instructions." *State v. Brown,* 10th Dist. No. 15AP-935, 2016-Ohio-7944, ¶ 18, citing *State v. Walburg,* 10th Dist. No. 10AP-1087, 2011-Ohio-4762, ¶ 53.

{¶ 57} Lastly, appellant argues that defense counsel's questioning of him "was woefully insufficient and might have contributed to the failure of the Court to provide a self-defense instruction." (Appellant's Brief at 30.) Appellant maintains that "[t]he Defendant-Appellant seem[ed] unprepared to discuss his feeling at the time of the assault and robbery and defensive shooting." *Id.*

{¶ 58} While appellant claims that counsel's questioning was inadequate and may have contributed to the trial court's decision not to give the requested self-defense jury instruction, he fails to suggest what questions, if any, counsel should have

31

asked that would have compelled the court to provide such an instruction. Additionally, " 'an appellate court reviewing an ineffective assistance claim will not second guess counsel's strategy in direct and cross-examination.' " *State v. Lefthandfull*, 10th Dist. No. 00AP-584 (Mar. 6, 2001), quoting *State v. Gray*, 10th Dist. No. 99AP-666 (Mar. 28, 2000).

{¶ 59} Further, **appellant's contention that he was "unprepared to discuss his feeling" is belied by his own testimony**. Appellant candidly and without hesitation discussed "his feeling" about the altercation and robbery when he testified that he was "scared," "afraid," "nervous," and "in fear of [his] life" during the incident. (Tr. at 544.) Further, the record is devoid of evidence about discussions between appellant and trial counsel regarding trial preparation. Because a claim of ineffective assistance of counsel arising from counsel's alleged failure to adequately prepare him to testify relies on evidence outside the record, such a claim is not appropriate on direct appeal. *See State v. Davis*, 10th Dist. No 05AP-193, 2006-Ohio-5039, ¶ 19 ("When allegations of ineffective assistance of counsel hinge on facts not appearing in the record, the proper remedy is a petition for post-conviction relief rather than direct appeal.").

{¶ 60} For all the foregoing reasons, appellant has failed to demonstrate that he was provided ineffective assistance of counsel at trial.

{¶ 61} Appellant's third assignment of error is overruled.

*Collins*, 2020-Ohio-3126, ¶¶ 45-61.

Respondent argues that this Ground is also procedurally defaulted, because Petitioner abandoned his ineffective assistance claims at the Supreme Court of Ohio. (ECF No. 10, PageID 956.) Respondent is correct that when Petitioner appealed to the Supreme Court of Ohio, he did not raise any ineffective assistance of counsel claims. (*See* Jurisdictional Mem., ECF No. 9, PageID 190-198.) To the extent Petitioner's claims were based on matters appearing in the record—i.e., the first two parts of his claim concerning a voluntary manslaughter instruction and the use of the word "victim"—these claims are procedurally defaulted by virtue of his failure to raise them on direct appeal to Ohio's highest court. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (petitioner's "failure to present three of his federal habeas claims to the [state] Supreme Court in a timely fashion has resulted in a procedural default of those claims").

To the extent that the third part of his claim concerning trial counsel's lack of preparation could have been brought through a petition for post-conviction relief, it too is procedurally defaulted because Petitioner did not file such a petition, the time in which to do so has expired, and it does not appear that he can meet the jurisdictional requirements for filing an untimely petition under Ohio Revised Code § 2953.23.

In Ohio, appellate claims that do not appear on the face of the record must be brought in a post-conviction petition pursuant to Ohio Revised Code § 2953.21.  *Hill v. Mitchell*, 842 F.3d 910, 936 (6th Cir. 2016) (citing *McGuire v. Warden*, 738 F.3d 741, 751 (6th Cir. 2013) (citing *State v. Cole*, 2 Ohio St. 3d at 113))).  Petitioner did not file a § 2953.21 petition raising these outside-the-record claims.  (ECF No. 3, PageID 27, 33; ECF No. 9, PageID 256-257.)  He cannot now file a timely petition because the deadline to do so has passed.  *See* Ohio Rev. Code § 2953.21(A)(2)(a) (requiring a timely petition to be filed "no later than three hundred sixty-five days after the date on which the trial transcript is filed in the court of appeals in the direct appeal of the judgment of conviction").  Here, the corrected trial transcript was filed in the state court of appeals in August 2019, making any timely post-conviction petition due in August 2020.  (ECF No. 9, PageID 260-261.)

Nor does the record reflect that Petitioner can make the requisite showing for filing an untimely state post-conviction petition alleging ineffective assistance of counsel.  He would have to show, among other things, that he "was unavoidably prevented from discovery of the facts upon which [he] must rely to present the claim for relief," or that he is making a claim based on "a new federal or state right," recognized by the United States Supreme Court, "that applies retroactively" to defendants like him.  Ohio Rev. Code § 2953.23(A)(1)(a).  Petitioner does not identify any such new and retroactive right, and would have known, when he testified in 2019,

about how counsel prepared him to testify.  *Collins*, 2020-Ohio-3126, ¶ 3.  This avenue is accordingly closed to Petitioner, and the claims raised in Ground Three are procedurally defaulted.

As noted with respect to Grounds One and Two, Petitioner does not attempt to excuse his procedural default.  (*See Petition*, ECF No. 3, PageID 36.)  He did not file a reply with any argument addressing the issue.  Accordingly, the undersigned concludes that Petitioner's ineffective of counsel claim presented in Ground Three is procedurally defaulted, and that Petitioner has given no reason to excuse the default.

Ground Three must therefore be **DENIED**.

## V.    CERTIFICATE OF APPEALABILITY

A state prisoner seeking federal habeas corpus relief is not automatically entitled to appeal a district court's decision denying relief unless the district court issues a certificate of appealability ("COA").  28 U.S.C. § 2253(c).  A district court should issue or deny a COA "when it enters a final order adverse to the applicant."  Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts.

To be entitled to a COA, a petitioner must demonstrate "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).  The Sixth Circuit has also cautioned that "a court should not grant a certificate without some substantial reason to think that the denial of relief might be incorrect."  *Moody v. United States*, 958 F.3d 485, 488 (6th Cir. 2020).

"When a district court denies a claim on procedural grounds, the court may issue a COA only if the applicant shows 'that jurists of reason would find it debatable whether the petition

states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Hill v. Bauman*, No. 20-1091, 2020 WL 4346669, at *1 (6th Cir. May 21, 2020) (quoting *Slack*, 529 U.S. at 484).

Here, reasonable jurists could not debate that Petitioner's claims are procedurally barred. A certificate of appealability, therefore, should be **DENIED**.

## VI.  CONCLUSION AND RECOMMENDED DISPOSITION

Upon review of the Petition, the State Court Record, and Respondent's Answer/Return of Writ, the undersigned Magistrate Judge concludes that the claims Petitioner has raised herein are procedurally defaulted and the default is not excused.  Thus, the claims cannot be reviewed on the merits.  The undersigned therefore **RECOMMENDS** that:

1. the Court **DENY** all the grounds for relief set forth in the Petition and **DISMISS** the Petition **WITH PREJUDICE**.

2. the Court **DENY** a certificate of appealability with respect to all the grounds for relief.

3. the Court **CERTIFY** that any appeal of the Court's dismissal would not be taken in good faith, and on that basis **DENY** Petition leave to proceed *in formal pauperis* on appeal.

## VII.  NOTICE REGARDING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

If any party objects to this Report and Recommendation ("R&R"), the party may serve and file specific, written objections to it within **FOURTEEN DAYS** after being served with a copy thereof.  Fed. R. Civ. P. 72(b); Rule 12 of the Rules Governing Section 2254 Cases in the United States District Courts.  All objections shall specify the portion(s) of the R&R objected to

and shall be accompanied by a memorandum of law in support of the objections.  The Court may extend the fourteen-day objections period if a timely motion for an extension of time is filed.

A Judge of this Court will make a de novo determination of those portions of the R&R to which objection is made.  Upon proper objection, a Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the R&R will result in a waiver of the right to have the District Judge review the R&R de novo, and will also operate as a waiver of the right to appeal the decision of the District Court adopting the R&R.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


*/s/  Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE